Madam Clerk, please call the next case. Before we begin today for the record, Justice McBain will not be present here for this argument. She is presently listening to the recording of your arguments. She is a full participating member of this panel and will fully participate in the decision on this case. She has the record and the arguments. So for the record, I wanted to make that noted. Mr. McCall, you may proceed. On behalf of Respondent Appellant Jeffrey Wilson, we contend that the judgment and orders entered against him should be reversed on two separate and independent grounds. The constitutional issue is multiple and is independent of the contention that we have made that the circuit court ruled against the manifest weight of the evidence when it found that Respondent Wilson violated the Stalking No Contact Order Act. But perhaps to start this discussion, we could first look at the definition of reasonable person in the Stalking No Contact Order Act. The definition of a reasonable person is not what appears anywhere else in prior Illinois common law and has not been challenged because there's been no challenge to the constitutionality of this act passed in 2010 or in other similar acts with respect to their definitions of reasonable person as we are discussing in this case. The definition of reasonable person is a person in the petitioner's circumstances with the petitioner's knowledge of Respondent and the Respondent's prior acts. It's petitioner, petitioner, petitioner. It's not the reasonable person or the rational person understanding that we have in Illinois common law or in other laws that have addressed this issue of stalking. And in fact, if the court looks at other states, which both sides have submitted to this court, if you look at Minnesota's law, Ohio's law, New York's law, Kansas' law, all the other laws cited to this court, Utah and others, they don't redefine reasonable person. Only Illinois does that. Illinois stands alone on that. So for the state to say, well, it's just like these other laws, it's not. The Illinois Stalking No Contact Order has to stand or fall on its own merits, can't be bootstrapped or snapped to the other states that have not redefined reasonable person. What else have the other states done that Illinois has not done? The other states in their laws cited by both sides, all sides to this court, have added things such as direct causation, not just presumed causation. In other words, proof that certain acts actually cause emotional distress or fear in someone. Because again, this law does not deal, unlike with People v. Bailey, People v. Bailey dealt with the fear of physical force being used on someone. This law not only doesn't deal with that, the circuit court is told in one of the provisions of the act, you can't require a complainant to show any use of physical force on you. So the entire act is in a different realm. We're talking about fear and emotional distress and mental anguish type of situations. We're not talking about somebody in fear of their personal or physical security. So when there's a use of a definition that is that expandable, it's going to expand and contract with each petitioner that comes to a circuit court and files a petition. Does this petitioner have a personality that's shy? Is this petitioner aggressive? Does this petitioner have depression? Does this petitioner have a bipolar issue? It doesn't matter under the act, because the act takes each petitioner as he or she comes to the court and says we're going to look at the respondent through their eyes, their perspective, and their view of the respondent and the surrounding circumstances. That's why the act is fatally vague and overbroad. There is no concrete set of details in the act that tells Illinois citizens, you're in violation of this act because you've called somebody too many times after they've told you not to, or you've visited their office too many times after they've told you not to do that. It's totally left up to what the petitioner finds to be upsetting. Are you saying there are no other statutory enactments that have that focus? Well, the other statutes that the state in particular has pointed to, the cyber-stalking statute, for example, that one says look at the victim's circumstances. They don't even have the extra phrases that the Stalking No Contact Order Act has. And the People v. Suket case, they never address the issue of does the cyber-stalking statute sufficiently and definitely define reasonable person. This issue is untested and pointing to the other stalking statutes does not move this issue to resolution because they've either, as in the cyber-stalking statute, never been resolved as to what's a reasonable person and is it sufficiently definite, or if it's People v. Bailey, the backstop position doesn't apply here. Because People v. Bailey, if you're in fear of your physical security, that trumped everything. That's what the Illinois Supreme Court said. We don't have that here. When there's no provision in the act and no requirement of a finding by the circuit court, that someone be in actual concern about their physical security, we're in a new land. So to say that, well, it's like the criminal anti-stalking statute where the physical security and violence is to be deterred, that's not in this act. The provisions in this act, the purpose provision, Section 5, it does say stalking is a crime, which is a separate issue we'll get to, but it doesn't say that the purpose is to stop violent attacks. The purpose is to deter people from sustaining fear and emotional distress. It's not to secure their personal safety. And that act has been much mischief as evidenced in this case, because on the second ground that we've also contended, that the facts were actually in favor of Officer Wilson were ignored, which may not be a surprise given the structure of the act. The videos speak for themselves. Over 98, 99% of the video show Officer Corey Miller sitting in the center of an office and other people in the periphery or the margins. The circuit court erred and ruled against the manifest way to the evidence when that court ruled that the video was on Ms. Nicholson for 30 or 40 minutes before the view was moved. And that error was twofold. One was the evidence was uncontested that Officer Wilson was on the phone. The phone records were put into evidence for about half an hour with a software representative, and he did not pre-program where the camera was first pointed in the office. 11 minutes into that call, Detective Feehan, who testified against Officer Wilson, said the camera was reoriented towards the full width of that view of the office, and in that video from minute 11 on, Detective Feehan said, it's someone else in the center. Well, that's someone else's Officer Corey Miller. It is not Ms. Nicholson. And the second major issue that led the circuit court to find Mr. Wilson in violation involved the Sentinel GPS device. But Detective Feehan admitted on the stand that he could not say that there was any direct evidence, so he had to use circumstantial evidence, which is fine, but his circumstantial evidence was not enough under the law. His circumstantial evidence was he and Detective Snow, Sergeant Snow, would create a timeline. The timeline was based on card swipe data that officers used to go into the building at the main entrance, but the card swipe data was useless in this instance because the vice unit office has a physical door with a physical key that does not trigger the card swipe system. And Detective Feehan admitted that he couldn't say that more than 50% of the time, officers could go in and out and never trigger the card system. He knew that possibility existed. Well, that's already getting less probable than not for his timeline. And then the end of that was the secretary in the vice unit office who said, oh yeah, most of the time the vice unit officers don't go through the card swipe system doors. They use the physical key and come through the back door. That's how they come in and go out. And that was borne out in Detective Feehan's timeline because in that timeline it would capture some officers. I think Aaron Barish was captured one week for less than ten minutes, but the court was told this shows more probable than not that somebody used the GPS device on Ms. Nicholson's vehicle, which by the way the track showed was also used on Mr. Wilson's vehicle. In addition to ignoring any idea or investigating any concept that someone else other than Officer Nicholson or Officer Wilson used the GPS device to track both of them, the theory used against Officer Wilson was, well, he was available. He's around. He's the expert. He knows how to do this. There are multiple problems with that that came out of trial as well. The Sentinel GPS device is a historic tracking device. It doesn't tell you where the car is now. It doesn't tell you where the car is going. It tells you where the car was. It's the most primitive GPS device in the unit. And Detective Feehan, again, who testified against Officer Wilson, conceded on the stand it's as easy to use as a smoke detector. You put in the two 9-volt batteries. You attach it to the car. That's it. So their backup position came. Well, okay, that's easy. But what's hard, and frankly it sounds easier than most cell phones, what's hard is that you have to have a cable and download it into the laptop computer. Well, Detective Feehan admitted on the stand, well, the cable was in the box when he opened it up. And other people testified, including Officer Wilson, the cable had a label that said, this cable goes with this GPS device, and you put it in. And you download the data into a laptop. The laptop had a password on the label on the top of the laptop. So anyone who had access to the vice unit office, which isn't just vice unit officers, could go in, use this stuff, and there's no sign-out sheet. There were no orders on how to use it, even though Officer Wilson testified that he actually tried to get forms to be adopted for the use of the GPS unit device, not just a form to sign the device out, but also to employ a comprehensive order to use the device. But that was ignored at trial, and he was found to have used the GPS device on evidence that doesn't even come close to a preponderance of the evidence standard. And our contention is that while those are two separate issues, the vagueness of the statute, since you have to take the petitioner's view of the world and the petitioner's view of the respondent, only encourages that kind of factual error in ruling against the manifest weight of the evidence. One of the other contentions the state makes is, well, the law can't be precise, and it's a civil law, so more imprecision is allowed. But again, what kind of civil law is this? This is a civil law that subjects somebody to greater, even though it doesn't have it in the Act, punishment than most misdemeanor convictions. You don't just pay a fine and walk out of the courthouse. As in this instance, you get an order entered against you. The respondent was first barred from his workplace for a month, then he was allowed to go back to his workplace, then his Second Amendment rights are still only allowed to be exercised on the job. He can't have any firearms, so he's a policeman who off work cannot defend himself the way other police officers can. And he's restricted in his movements for two years. But the state will tell us, oh, that's just like every other injunction proceeding. Really? Other injunction proceedings require balancing of the factors. As a circuit court correctly denied one of our lines of questioning, wait a minute, this Act doesn't allow the balancing of factors. We don't balance the weight of the harm on one party versus the other, because the Act excludes that kind of analysis. That's one way it's not like a civil injunction. Another way it's not like a civil injunction is that someone who's wrongfully enjoined has no remedy for damages. None. And another way is that this Act incorporates Criminal Code Article 5 to hold the respondent responsible for the acts of others, even if that respondent had not committed the acts himself or herself. And you get automatically entered your name into a database with law enforcement authorities. It's not a civil injunction. And as far as equal protection, this Act clearly, in its Savings Clause, creates two problems. One is it states a tautology. Oh, if you're doing something protected by the First Amendment, you won't be covered by this Act. That's like saying a beginner is someone who just started. That doesn't tell any citizen anything. The only carve-out provision it states is that if you're in a labor dispute and you're doing something in a labor dispute and picketing, anybody who's been on a picket line knows that would qualify under this Act as stalking or other laws, you're not covered by this law. So it favors labor dispute actions over everything else. Everything else a citizen is told, take your chances and just hope that the First Amendment will be there as a catch-all for you. There's no list like in the Minnesota law that includes exemptions such as your contractual duty or your employment duty, such as with Officer Wilson who had to test video cameras and equipment. He doesn't have any of those protections the other laws offer. The New York law says that you have to show there's no legitimate purpose, the petitioner does, to what respondents' actions were. None of that exists here. So it's totally left again to the vagaries of each petitioner and that's why we contend the Act is unconstitutional on the grounds of vagueness and on the grounds of equal protection and why we also contend that the circuit court ruled against the manifest way of the evidence and we ask that the circuit court be reversed and that all those orders entered against Mr. Wilson be dismissed with prejudice and terminate this proceeding with a complete dismissal with prejudice or alternatively remand for a new trial based upon the evidentiary errors committed by the circuit court in so holding. Thank you. Questions? No questions? Mr. Scodro, I believe you are next. You may respond. Thank you, Your Honor. Mike Scodro on behalf of the Illinois Attorney General's Office. We represent the intervener appellee, the state of Illinois in this case. Pursuant to agreement, we're splitting time evenly with my co-appellee represents the petitioner in this case. Consistent with the state's interest in the case and also with our briefing, I'll limit my remarks to the constitutional questions raised in the case and counsel for the respondent will focus her remarks, or petitioner I should say, will focus her remarks on the factual issues raised in the case. There is nothing to the constitutional challenge in this case. And let me begin with vagueness because that's where opposing counsel began. The idea that this is facially vague, and I should remind the court the standard that the Illinois Supreme Court provided for facial vagueness in a case like this is that the act has to provide no standard of conduct at all. It's ambiguous to the point where it's incapable of valid application. This law comes nowhere close to that. It provides a number of specific elements. It requires two or more instances. It requires the specific person be targeted, unlike the Minnesota law that was struck down. It requires that the individual know or should know of the likely effect of their actions, their conduct on the reasonable person. And it does use a reasonable person standard. I do want to put to one side that there's any concern here that there's something novel about the reasonable person under the circumstances test. As we point out in our brief, and opposing counsel does not respond to any of these authorities on reply, the restatement of torts at section 283, which defines reasonable person in one sentence, this is the reasonable person standard we have come to know and love for centuries, is defined as the reasonable person under the circumstances. That is the objective reasonable person standard that tort has used. We point out in our brief that the same goes for the victims of intentional infliction of emotional distress under Illinois law. The McGrath case that we cite makes clear that you have to consider the circumstances of the victim of an IIED claim when considering intentional infliction of emotional distress. That case involves someone who had a heart condition, and not surprisingly, the court, because the defendant in the case was well aware of the heart condition, the court not surprisingly considered that and admonished all future courts to consider those sorts of circumstances in evaluating the victim in an intentional infliction of emotional distress circumstance. Now, perhaps the concern then is, well, in addition to saying under the circumstances, which is the traditional tort standard, it also says with knowledge of the respondent's prior acts toward that person. But that's essential, and actually, if we think about it, that affects and protects would-be respondents far more than it helps would-be petitioners. Imagine if you didn't get to consider prior interactions between the victim and the respondent. Well, under those circumstances, there'd be no difference between the mailman coming up to your front door and leaving a package and someone that is your former assaulter recently out of prison coming up to your front door and leaving a package. It would be the same if you couldn't consider the prior history between the people. Of course you need to, otherwise mailmen would be hauled in as stalkers routinely under the statute. My opponent also, in fact, well, I should add the following point. In the court's order here at page 132 of the appendix, the court actually helped respondent by considering the circumstances and prior interactions between these two individuals. Respondent got the benefit of this rule in this very case. The court said on page 132, you know, I'm going to disregard these day-to-day passing incidental interactions between these two individuals because, after all, they're co-workers. Of course they're going to have passing interactions of that nature. Well, that's precisely the context. It's the context of the circumstances that a court understandably considers. It doesn't make reasonable person suddenly a subjective standard. It isn't a subjective standard. It is the reasonable person under those circumstances, just like it is in tort. And to provide even further protections in the definition of stalking in section 10, it ensures that the, and I mentioned this state of mind requirement a moment ago, it ensures that the petitioner, or rather the respondent, knows or should know that their course of conduct will have this effect on the person. Well, that means the would-be respondent is insulated against circumstances that that person would have no idea about, just as going back to intentional affliction of emotional distress in the Supreme Court's decision in McGrath, of course the defendant in that tort case wouldn't be responsible for a heart condition of which that defendant had no knowledge. That protection as well is built right into the statute. So again, to find a statute facially invalid requires an extraordinary finding, that there really is no core of conduct recognizable under the statute. That isn't even close here. And the notion that somehow this has modified and made what has been for hundreds of years an objective standard into a subjective one is simply inconsistent with the statute and is impossible to square with Illinois law. I'll turn very briefly to the equal protection argument. The Supreme Court's decision in Bailey resolved this issue. The Supreme Court's decision resolved that issue, and Bailey, contrary to comments made by opposing counsel, the court in that case made clear it was concerned not only with preventing future violence, but also in protecting people from the psychological harms that come with being threatened. And finally, on over-breath, I would just note, excuse me, that the Illinois Supreme Court, the U.S. Supreme Court have made clear a facial over-breath challenge is extraordinarily difficult to make out, and it is especially so. The doctrine has very little purchase in cases like this one where we're talking about a statute that is designed at conduct with, if anything, an incidental effect on communication. And I would argue there is no effect, even an incidental one here, given the carve-out for First Amendment conduct. And courts have routinely looked to carve-outs like this one. It's not impossible for people to understand them. This district in Holt, in upholding the statute before Bailey did, relied upon the carve-out, the savings clause, in that very statute, which also provided a protection for First Amendment rights. Other courts around the country have relied on this carve-out for First Amendment rights. So the notion that it's meaningless to inform people that their First Amendment rights are protected is absurd and inconsistent with what other courts have held, including this one. If the court has no further questions about the constitutional issue. You are saying in reasonable person definition in the statute that the phrase, with the petitioner's knowledge of the respondent and the respondent's prior acts, is actually a limitation in favor of the respondent? I think in many obvious cases. I think one could easily conceive of hypotheticals in which it helps and which it hurts. But it seems to me that in the run of cases, it's far more likely to protect the person who's coming to your doorstep for purely innocent reasons than it is to capture someone who is actually acting completely innocently and is somehow now swept in as a stalker. The example in our brief, I think, captures this. If I've recently hired a contractor and I see them in my backyard at 9 a.m. and they're taking photographs of my house, well, I know who this is. It's a contractor. If what the respondent is asking is that the courts go in blind, well, suddenly that contractor could be a very menacing figure. Whereas in contrast, if who's on my lawn is someone who violently assaulted me five years ago is now recently out of prison, appears taking photographs of the second story of my home, I think it would be ridiculous not to consider the fact that I know this is not a contractor. I know this is not someone from the parks department or the water department. This is the person that violently attacked me five years ago, and so certainly it will be harmful for that person. But I do think in the run of innocent conduct, it puts it to one side. Thank you. Ms. Pollack, you may respond. Good morning. May it please the court and counsel, my name is Elizabeth Pollack. I represented Donna Nicholson at the trial level in this case, and I continue to represent her on the appeal in this case today. I will be addressing the court regarding the manifest weight of the evidence challenge that was briefly addressed by my opposing counsel in his initial argument, and all I can say about this case is that we must have been watching different videos with his construction of what those videos showed. This is a case where along the lines of other no contact orders and orders of protection, generally these cases take a couple of hours, maybe a half a day if there's a lot of evidence. This case took two and a half days, and we heard from almost 15 witnesses as to what exactly happened between these two parties while they were both employed by the Peoria Police Department. And counsel is taking snippets of the record and blowing them out of proportion to make it look as though there is some doubt as to the sufficiency of the evidence. Well, this is not a criminal case. The burden of proof on the petitioner was preponderance of the evidence. And we heard from multiple witnesses about their relationship, and I'll briefly sum it up for the court. In 2008, which was not one of the bases that the court used in entering the order, there was an interaction between the parties where the petitioner, Ms. Nicholson, believed that the respondent was videotaping her desk at the police station. She became upset and angry. She reported the incident to her superior officers. No investigation was started. Nothing was done about it. However, there was an oral order from the commanding officer in the division for the respondent not to videotape within the office. He said, don't tape her. As a matter of fact, he even said on the record, if you really need to test your equipment, just point them at my desk because I don't care. That was the basis, the beginning of this videotaping relationship. Now, in 2010, it wasn't the petitioner who discovered the videotaping. It was, in fact, her sergeant who was using the respondent's desk to check a fantasy football score and happened to see that there was an office camera that was recording. Now, he has said that this was really focused on Officer Cory Miller. Well, what he didn't say was that Cory Miller's desk was adjacent to Donna Nicholson's desk. It was focused and had both desks in the frame. So it was focused on the petitioner. And the story that respondent has told has changed multiple times. At first, he denied knowing the camera was there. He said, maybe Detective Feehan, the computer guy, maybe he came in and did something about it. Then all of a sudden, oh, I was just testing my equipment. Then it was, well, I didn't know it was recording. We have a self-described computer and technical surveillance expert. The record reflects through his own testimony and that of other people that he was the go-to guy in the department. He was the one who handled all the GPS devices. He was the one who handled all the surveillance cameras. He did their maintenance. He did their repairs. He coordinated the purchasing of the equipment. This was the guy, the one, who did these repairs. So for somebody who describes himself like that to say, well, I didn't know it was recording, is beyond the realm of belief. And it is up to the trial judge to make the determination regarding credibility of these cases. The trial judge heard these arguments from the respondent. He also heard the testimony of the petitioner and the other officers who testified. And he found that the other officers in the petitioner were more credible, that the respondent's version of events did not sit well. And that's his determination to make based on the behavior of the witnesses and what he observes at the trial court level. Now, the videos in question, it wasn't just one. It makes it seem as though there was just one lengthy video. There were multiple videos that were taken off of the computer that respondent worked at over the course of only a week. Several of them were short clips that focused only on the petitioner. The lengthier clip, which ran and recorded the office overnight, was focused on petitioner's workstation, which was adjacent to Corey Miller. And yes, there were shots of other people in that video, but there were shots of petitioner that ran successively while she was working at her desk for multiple minutes consecutively. So yes, he was monitoring her. And there were multiple occasions on which the respondent was instructed not to videotape her. In 2008, by the petitioner herself in 2008, who yelled at him in the office and caused a scene because of how upset she was at being videotaped. Then there was Sergeant Edelman in October of 2010. Officer Aaron Barish in November of 2010, right before the videotaping was discovered, had noticed the feed on his desk and said, hey man, you're not supposed to be doing that because remember how horrible she reacted in 2008. Quit it. So he knew he wasn't supposed to be doing it, and yet he is covertly recording images of this woman, clearly making her feel terribly upset. So with regards to the videotaping, I don't think it holds any water at all that he didn't mean to or he was just doing his job because he had been instructed previously not to do so. Which brings us to the GPS allegations, which as counsel pointed out, the GPS tracking unit only tracked the parties. It didn't track anybody else in the police department. No witnesses, no confidential informants. It was just the officers. We had testimony from every other officer that ever took a GPS training course. All of them said, I don't know how to use this. Detective Fehan, who was the computer forensic expert, he investigated the computer, he took the print of it, he went to go download the tracks, and he said, for a device of that age, without training, it would be difficult to get the tracks off of the device onto the computer. The only one with the training was the respondent. He's the only one. Again, the self-described technical expert. When the brief of counsel... The other officers had not had any training? Not in that device. They had had training in a future device called an ST811. This was a Sentinel, which is one of the older models, and none of them had had training in that, except for one guy, and he said he couldn't remember how to work it. So that's everybody in the office that had that training. Now, counsel points out in his brief that this is a matter of availability, that the internal police investigation that the court used and heard in evidence, which took over eight months, that somehow they were never conclusive enough, because all they proved was that the respondent was available to do this. They never definitively proved it. He even says that the evidence, he wanted to exonerate. Again, this is not a criminal case where there needs to be exoneration. He said there was no physical evidence or eyewitnesses. Counsel has one minute. This was not a criminal case. This is a preponderance of the evidence. And what the police investigation showed was that immediately before the GPS tracks were downloaded onto the computer, which sat at respondent's workstation, which he professed to control, which the equipment went on that he was responsible for, he was at his desk, had logged in, and had sent an email. Immediately after the tracks were downloaded, there's a phone call from his desk. Immediately after the GPS device is installed on Officer Nicholson's vehicle, takes 15 to 20 minutes according to Detective Feehan, he walks in the property room door but doesn't register any evidence. Never had gone in that door before. Now, yes, is it possible that there's some straw man who maybe avoided the key card swipes and who logged into his computer with his name and tried to frame him for this? Well, I suppose that in a movie that could happen. But the evidence here is definitive. No, there's no video. If we had video evidence, we wouldn't be here. We weren't keeping him putting the GPS device on her vehicle. What happened was that of all the officers in the Vice Narcotics Unit, he had the access, he had the training, he had the availability, he was present at his desk immediately prior to and after the GPS tracks were downloaded. He was present in the area of the Officer Nicholson's vehicle immediately after the GPS device was put on her vehicle. And in sum, that is proof by a preponderance of the evidence. There was no manifest error. We request affirmation. Are there any questions? No, I don't believe there are. Thank you. Mr. McCaul, you may reply. First off, on pages 169 to 170 of the record, Detective Veehan testified that after digitally, exhaustively going through everything Officer Wilson had that was electronically stored information, he found nothing about Donna Nicholson. Not to her, not about her, anything about following her, any evidence of threats, nothing. The evidence about the access is less probable than not because the entire timeline relies on people going in and out of the Vice Unit office. And as Detective Veehan conceded, he can't show more than half the time who's going in and out of the office. But it gets worse. Why? Because they can't even say where the laptop was. In fact, Detective Veehan, and it's in our reply brief, it goes into detail, either you or Sergeant Snow, about how they have no timeline that shows anybody with the device downloading it into the laptop. It is the most primitive GPS device. That's why anybody could use it. If it's as simple to use as a smoke detector, you put in two 9-volt batteries and put it on a car, and then put a cable on it to put it in the labeled laptop computer,  Police officers use all kinds of technology. This idea that they go around and none of them know how to use anything is absurd, and the record does not support that. Further, as far as the definition in the act itself... So you're saying that there wasn't testimony from those officers that they didn't know how to use it? There were a couple officers who said that they weren't familiar with it, but if they can use the more complicated GPS device, the modern ones that actually tell you where a vehicle is now and that have more gadgets and switches, this thing doesn't have a switch. It has no switch. Batteries go in there, it has a magnet, you put it on the car, that's it. Anybody in the police department can use it. It's the simplest device of all of them. It's simpler than a camera. So going back to the act, we've been told the reasonable person is a reasonable person, but that's not what the act says. It says a reasonable person means a person in the petitioner's circumstances, with the petitioner's knowledge of the respondent and of the respondent's prior acts. Again, they can't cite, the state can't cite any other state anti-stalking law that defines and, in essence and summation, redefines reasonable person to such a vague standard, nobody knows what it means, and no matter how many times the states say, well, it means a reasonable person, then why redefine it? Why is there a new definition of reasonable person? The opposing counsel would suggest that phrase, with the petitioner's knowledge of the respondent and the respondent's prior acts, is actually a prophylactic for wrongful accusations. It's actually the opposite, because it enables any petitioner to be believed, whether or not there's anyone sane, which by this definition is being told to left the building. There is no more regular reasonable person. We have a new reasonable person, and the McGrath case shows that, because it cites a restatement section of torts, and objective factors such as the existence of threats. Of course all those cases were addressed in our briefs, and we stand on our briefs as well as our oral arguments. There is no objective factor, there are no threats here, there's no disparity in power, they're both fellow officers. The McGrath case is useless, because it cites a restatement section that has all objective factors, none of which appear in the act, none of them. The act doesn't require a threat, the act doesn't require disparity in power or position, so restatement section 46, comment E, it doesn't appear in the act, it's not cited in the act, it's not incorporated in the act. The state just tells us, trust us, trust us it's in there somewhere. Somewhere you're going to find the First Amendment. Well, just saying that the First Amendment protects you is useless, because if you are found in violation of this act, for doing your employment duties, and as the uncontested evidence of Mr. Wilson showed, he's saying he was retaliated against because in 2009, he had labor policy disputes with Ms. Nicholson about not being transferred, everyone else in the vice unit office was transferred every five years, she was not. He complained about some policies of the supervisor, she brought in the supervisor to try to out him on that, those were two incidents in 2009 that led to the deterioration of their working relationship, and at that time, Mr. Wilson told Ms. Nicholson, I don't want to talk to you or interact with you unless it's absolutely required and part of our professional task. That's what Mr. Wilson told Ms. Nicholson, and Detective Feehan's exhumation of all the electronically stored information of Officer Wilson objectively shows that. He was avoiding her, he was trying not to interact with her. The fact that one day a camera may have run, or a pinhole camera, we asked the court to look at all the film. You'll see the film isn't focused on her. Most of the film, she's not front and center, and in fact, when he pulls the pan camera, he pulls it away from her to where Officer Corey Miller is, in the center of the office. It's not a big office, but Corey Miller's front and center, and the pinhole camera videos that were referred to are two minutes in length at the most, and most of them less than a minute, and show Mr. Wilson struggling, trying to figure out, he walks in front of the camera at times, okay, where is this thing looking? Because he's the first one to open the box and figure out how do these things even work. He's in the film. So this idea that somehow this is part of an overall scheme, there's no evidence of threats, no evidence of physically following Ms. Nicholson, no evidence of anything other than that he was trying to keep his distance from her due to their own discord. And that's why we believe that the record evidence shows the circuit court ruled against the manifest way to the evidence, in addition to this act being a boundless, rudderless statute that is ready-made for arbitrary and discriminatory application, which we contend occurred here. Thank you. Okay, thank you, counsel. Thank you, counsel, all, for your arguments in this matter this morning. It will be taken under advisement, and a written disposition shall issue. Again, for the record, Justice McDade is a full participating member of this panel and will have the benefit of the oral arguments that have been taped today as well as the record in your briefs. We'll stand in brief recess for a panel discussion.